OPINION OF THE COURT
Walter M. Schackman, J.
These are motions made to suppress statements given by defendants Coker and Alston to law enforcement officials prior to their arraignments on the charges of the felony murder of Herbert Finn, and the robbery of Finn and others, on the night of October 27, 1979. At issue are various statements made to police officers by defendant Coker and a video tape statement subsequently made pursuant to interrogation by an Assistant District Attorney of Bronx County. As to defendant Alston, our concern is with three statements made to police officers, and an aborted video tape interview with an Assistant District Attorney.
AS TO DEFENDANT OLANIYI COKER
THE FACTS
A tip was received by the detectives at the 50th Precinct in Riverdale on November 6, 1979, to the effect that a 17-year-old resident of Mount Vernon named Coker, who drove a yellow 1976 Dodge Colt (with a specific license number that was also given), knew about the Finn murder, had probably been there, and was frightened and wanted to talk. The detectives checked out the information on the car, and found that it was *705 registered in the name of Enid Coker, mother of defendant Coker, with an address in Mount Vernon.
Detectives Barrett, McKenna and Mielo, then proceeded to Mount Vernon at about 6:00 p.m. to check out this tip. They rang the bell at the Coker residence and talked to a woman who told them that she was a boarder in the house and not a part of the Coker family. She told them that the family would be home after 7:00 p.m. The detectives parked on the street and waited. Defendant Coker arrived home about 7:00 p.m. and parked in the driveway. The police then moved their vehicle into the driveway behind him, and Detectives Mc-Kenna and Barrett got out, while defendant Coker was also alighting from his vehicle. Detective Barrett called his name, and when defendant Coker went to his belt area with his hand, Detective Barrett drew his gun. Detective Barrett testified that he bolstered his gun as soon as Coker took his hand away, while defendant Coker testified that the detective approached him with gun out and pointed at him. It is uncontested, however, that when Detective Barrett reached defendant he had put his gun away. A conversation then ensued resulting in defendant Coker agreeing to go voluntarily with the detectives to the Riverdale Police Station. He also agreed to have the car checked out by them.
Defendant Coker testified that at that point he asked to see his mother; the detectives testified that Coker was asked if he wanted to speak to anyone in the house and he answered no, that no one was home. Coker’s testimony lacks credibility on this point. He knew that his mother had gone to Pennsylvania to visit his brothers. He had just left his sister at a friend’s home, and his father was in Albany on business. In addition, his parents were unaware of his alleged participation in the events of October 27, and he was obviously reluctant to bring them in at this point. I find as a fact, therefore, that defendant Coker went voluntarily with the detectives to the 50th Precinct.
Defendant Coker was given his Miranda rights in the police car by Detective Barrett, and he then made his first statement. I find that this defendant consciously, knowingly, and voluntarily waived his Miranda rights at that point. He was a senior at Mount Vernon High School, and an "A” student, apparently second in his class. On the witness stand he seemed to this court to be highly articulate and intelligent and, despite the fact that on direct examination he denied *706 that he had understood his rights, under cross-examination he indicated that he had understood them. This court is fully cognizant in making this finding that this was his first arrest and consequently his first experience with these rights. The defendant denied having been given his rights either in the police car or later at the station house, but the court finds this incredible, especially in view of the fact that Detective Barrett is a police officer with many years of experience.
At the 50th Precinct the defendant was arrested and given his rights again by Detective Barrett, from a card he kept with him. Another statement was then taken which lasted from 8:00 p.m. to 9:30 p.m. Coker was then put into a holding pen while arrangements were made to return with him to Mount Vernon to find and apprehend the others involved in the October 27 incident.
There is a conflict in the testimony as to attempts to contact defendant Coker’s mother at this time. Detective Barrett testified that he obtained a home phone number from the defendant and called it several times, getting busy signals. He testified that the defendant told him that the boarder sometimes took the telephone off the hook. Coker testified that at about 11:00 p.m., he asked Detective Barrett to call his mother and the detective said he would do so when they returned from Mount Vernon, since he didn’t want to alert the other suspected perpetrators; they were going out to arrest them. No contact was made with the family at that point and the detectives took the defendant in a van to Mount Vernon so that he could point out where he had dropped off the other occupants of his car on the night of October 27. Defendant Coker made other statements in the van during this time and he was not given his rights again before he did so. The detectives then left him at the Mount Vernon Police Station while they went out to make two arrests.
The defendant’s mother apparently arrived home between 9:30 and 10:00 p.m. She woke up her daughter after midnight (the daughter had arrived home at approximately 10:30 p.m.), quite concerned that her son was still not home. Defendant’s sister called the Mount Vernon Police Station and left two telephone numbers for them to call in case they heard anything about her brother.
When the defendant was returned to the 50th Precinct from Mount Vernon, at about 3:30 a.m., the detectives permitted *707 him to call his home. At the suggestion of Detective Barrett, he told his mother that he was helping the police with an investigation. The detectives advised her to come to the 50th precinct and provided transportation for her. She arrived there at about 4:00 a.m., spoke to her son in the presence of Detective Barrett and the defendant told her the same story. He did not tell her that he was under arrest and that the charge was murder, nor did the detective tell her when he spoke to her. Detective Barrett told her that it was a serious matter and suggested that she speak to other family members, but he did not suggest that she speak to a lawyer. Nor did he tell her that her son had made oral statements and was about to give a video tape statement. As Mrs. Coker was leaving the precinct, a call came through from her husband in Albany. It came in downstairs at the precinct, and she spoke to him twice before leaving. She concedes that at no time did she inform anyone that she was going to get a lawyer. Calls were subsequently made by her and a lawyer was obtained that morning, but there is no proof that this fact was ever communicated to the police officers in the precinct prior to the time the video tape statement was made.
At approximately 8:30 a.m., a video tape statement was begun and the defendant was once again informed of his Miranda rights. Significantly, after the question about obtaining a lawyer, there was a definite pause while defendant was obviously thinking it over and he then agreed to waive his right to an attorney. After the statement was almost completed, and while the video tape reel was being changed, Coker mentioned something about a lawyer, and then on the tape, he requested legal aid and the questioning then ceased. The performance of the Assistant District Attorney conducting this interview was exemplary, in that, at the time Coker first mentioned a lawyer he was told to repeat his request after the tape was changed so it would be recorded and as soon as this was done the questioning was terminated.
This court was impressed by the performance of all of the law enforcement officers involved in this matter. While there may be some discrepancies in the testimony, and while the court may not agree that the defendant’s rights were fully protected at some points, there nevertheless appeared to be a sincere attempt to balance the rights of the defendant with the need of law enforcement. There is no indication anywhere in this record that defendant was ever mistreated or coerced.
*708 THE LAW
The threshold issue is whether the defendant voluntarily accompanied the police officers to the Bronx precinct house. The information in the possession of the detectives at the time they went to Mount Vernon to find Coker definitely did not rise to the level of probable cause for an arrest. On the basis of the information received from the anonymous tip, there was only enough for the police officers to make further inquiry of Coker (Matter of Kwok T., 43 NY2d 213, 218; People v Cantor, 36 NY2d 106; People v De Bour, 40 NY2d 210, 216-218), which they did in a reasonable manner.
After asking several questions, defendant Coker, as I stated above, voluntarily went with the police officers in their car to the 50th Precinct. Since consent is a valid substitute for probable cause (People v Hodge, 44 NY2d 553, 559), the detectives were justified in questioning him further. After the first statement in the car, before which the defendant had been given his Miranda rights, the detectives now had probable cause for an arrest. The defendant, 17 years old, could then be further interrogated, even without notification to his parents, unless such lack of notification in some way violated his constitutional rights. No such violation existed at the time the first two statements were made.
As to the statements made in the police van, a different problem exists. At that time, according to the defendant, he made a request to call his mother. The police were concerned with being able to locate and arrest the remaining suspects and made a conscious determination to proceed in doing that and not to contact the defendant’s mother first. At issue is whether they were then bound not to interrogate defendant any further. To make such a determination would take us one step further than the Court of Appeals went in People v Bevilacqua (45 NY2d 508). There the 18-year-old defendant asked for his mother before interrogation, after waiving his right to a lawyer. The court held that there was a conscious scheme to isolate the defendant from potential avenues of assistance. I do not find that to be the fact here, but I do find that there was a deliberate decision by Detective Barrett not to contact the family until the other suspects were apprehended. This is despite Detective Barrett’s testimony that he made some phone calls and received busy signals. It would have been a half-hearted attempt at best, since there were *709 other telephone numbers in the house that could have been called. This finding is also made despite the fact that when the defendant’s mother did come, she did not request a lawyer. I, therefore, hold that the statements made by the defendant in the van must be suppressed (People v Bevilacqua, supra; People v Townsend, 33 NY2d 37; People v Evans, 70 AD2d 886).
The last statement, the video tape, must also be suppressed. Here, again, this court must go beyond current case law in making this determination. The video tape indicates that despite some 14 consecutive hours of detention (although without continuous interrogation), the defendant was still alert, gave precise, intelligent answers to the questions, and concededly had not been mistreated by the police. But, prior thereto, the mother had arrived at the precinct and was not given the true status of the case against her son. Nor was she informed that a video tape statement would be taken shortly. Had she known these facts, the likelihood is that a lawyer would have been called in at this point (People v Bevilacqua, supra; People v Evans, supra).
This court does not hold that in every situation where a teenager over the age of 16 is in custody, there is a duty on the part of the police to notify a parent, or that when a parent is requested by the juvenile that all interrogation must cease, nor that the Miranda rights must be given to, and waived by, the parent. But, in the context of the various interrogations of defendant Coker in this case, I find that a parent should have been notified when he requested this before he was taken in the van back to Mount Vernon, and, furthermore, that once a parent did appear there was a duty by the police to give that parent an accurate and fair appraisal of the current status of the case.
Therefore, the defendant Coker’s motion is granted to the extent of suppressing all statements taken after the defendant Coker was taken from the 50th Precinct to go back to Mount Vernon.
AS TO DEFENDANT ALSTON
THE FACTS
On November 11, 1979, defendant Alston was arrested, for possession of a gun, in Mount Vernon. The police officers had had an accurate description of defendant and saw the *710 defendant remove a gun from his person and toss it under a parked van, from which they recovered it.
Defendant gave his age as 16, and he was brought to the Mount Vernon Police Station, given his Miranda rights, and was interrogated. The rights were read to him from a printed card which was signed by the defendant. He then gave a statement which mentioned his participation in the incident of October 27. At the start of the interview he gave his age as 18, and at the conclusion he gave a date of birth which made him only 15 years old. Subsequently, the Mount Vernon police notified the 50th Precinct in Riverdale of the defendant’s arrest.
Since the police were now aware of the possibility that the defendant was only 15 years old, they made some attempts to contact his mother. The telephone number given by the defendant for her was not answered initially, and later calls resulted in continued busy signals. The defendant’s mother testified at the hearing and corroborated this fact by stating that she had taken the telephone off the hook. There was also some testimony that the mother’s local police precinct, in Brooklyn, was alerted and instructed to go to the mother’s residence, but they failed to find her since they had an incorrect apartment number for her. However, the mother testified that her name, Nadine Alston, was on the mailbox. She was finally notified on the next day, November 12, at about 12:45 p.m. By this time, however, the defendant had made two additional statements to officers of the 50th Precinct (Lieutenant Mitchell and Detective Barrett), the first at the Mount Vernon Police Station and the second one after the defendant had been transported to the 50th Precinct in River-dale.
In addition to their efforts to notify the defendant’s mother after they learned he was 15, the police also contacted the Greer School in Millbrook, New York, after learning that the defendant had been the subject of a 1977 P.I.N.S. petition, and had been placed in the school’s custody in February, 1978. He had absconded, however, in August, 1979, and at the time of his arrest was living on the streets in Mount Vernon.
The records of defendant’s stay at the Greer Woody crest Children’s Services Agency, which were placed in evidence, indicate that during his residence there he made a generally poor adjustment. It is interesting to note that he has a history of being a pathological liar, which could well account for his *711 giving various ages while he was in police custody. He appears quite mature physically, certainly well in excess of 15 years of age.
THE LAW
As to the first statement given by defendant Alston, the court finds that it would be admissible at trial. There was undoubtedly probable cause to arrest him (People v De Bour, 40 NY2d 210, supra; People v Dunbar, 71 AD2d 805; People v McLean, 72 AD2d 588; People v Smith, 72 AD2d 636; People v Moore, 47 NY2d 911; People v Marner, 47 NY2d 982). He told the police officers that he was 16, and then 18, years of age. Considering his mature appearance, the police action in questioning him, believing him to be over 15 years of age, was proper (Matter of Hector C., 95 Misc 2d 255). Defendant cannot rely on his deliberate misrepresentation to have this statement suppressed.
The problem arises as to the statements made after the police became aware that he was only 15 years old. Their first duty was to verify this fact, in light of his previous statements to the contrary. Following this, they had a statutory duty of notification, pursuant to CPL 140.20 (subd 6), which states: "Upon arresting a juvenile offender [see CPL 1.20, subd 42] without a warrant, the police officer shall immediately notify the parent or other person legally responsible for his care or the person with whom he is domiciled, that the juvenile offender has been arrested, and the location of the facility where he is being detained.”
Their attempts to comply may have been sincere, but they were insufficient.
Defendant had absconded from the Greer School months before, and they no longer claimed any jurisdiction over him. The attempts to notify the mother did not reach fruition until 12:45 p.m. the next day. While the court is of the opinion that the statute sets up a per se rule, that is, that the person responsible for the child must be contacted, it is unnecessary to reach that far in arriving at the decision herein. I find that the attempts at notification were insufficient to reach the level of "every reasonable effort to give notice” (Family Ct Act, § 724, subd [b], par [i]). Merely receiving busy signals in response to telephone calls was not a sufficient excuse for failure to contact the mother. Although there was some testimony of an attempt by officers from the local precinct in *712 Brooklyn to contact her, it is the court’s opinion that these attempts were feeble and insufficient. The fact that the defendant’s mother had taken her telephone off the hook is not in the same category as the mother’s performance in Matter of Raphael A. (53 AD2d 592). In that case, the mother was notified, but stopped off for two hours on the way to the police station to eat dinner (see, also, Matter of Brian P.T., 58 AD2d 868; Matter of Emilio M., 37 NY2d 173; Matter of Penn, 92 Misc 2d 1043).
The motion to suppress is therefore granted as to all statements made by defendant Alston except for his initial statement given to Police Officer Sullivan at the Mount Vernon Police Station.